UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**Nicole Antakli,**

   Plaintiff,

               **DEMAND FOR JURY TRIAL**

vs.            Case No. 23-12084
              Hon. Shalina D. Kumar

**Charge Enterprises, Inc.,**     Mag.
a Delaware corporation,
**PTGi International Carrier Services, Inc.,**
a Delaware corporation, and
**ANS Advanced Network Services, LLC.,**
a New York limited liability company,

   Defendants.
_____

**GASIOREK, MORGAN, GRECO,**
**McCAULEY & KOTZIAN, P.C.**
Raymond J. Carey (P 33266)
Attorneys for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, MI 48334
(T) 248-865-0001
(F) 248-865-0002
Rcarey@work-lawyers.com
_____

## AMENDED COMPLAINT AND JURY DEMAND

  Plaintiff Nicole Antakli ("Plaintiff" or "Ms. Antakli"), by her attorneys,

GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN P.C., for her

Amended Complaint against Defendants, Charge Enterprises, Inc. ("Charge"), PTGi

International Carrier Services, Inc. ("PTGi"), and ANS Advanced Network Services, LLC. ("ANS") (collectively "Charge Defendants"), states as follows:

1.     This is an action by Ms. Antakli against the Charge Defendants for discrimination against her on account of her sex and interference with and deprivation of her right to be free from discrimination on account of her sex in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L.A. §§37.2101, *et seq*.; unequal pay and interference with protected rights in violation of the Equal Pay Act of 1963, 29 U.S.C. §§ 201, et seq., *see* 29 U.S.C. § 206, 29 U.S.C. §215(a)(3); breach of contract,  promissory estoppel, unjust enrichment, and conversion in violation of Michigan common law; and conversion in violation of M.C.L.A. 600. 2919a.  Ms. Antakli's claims are premised on the terms and conditions of and circumstances leading up to and including the termination of her for employment with the Charge Defendants, effective June 19, 2023.

### PARTIES, AGENTS, AND REPRESENTATIVES

2.     Ms. Antakli is female who currently resides in the City of Birmingham, County of Oakland, State of Michigan, and formerly was employed by the Charge Defendants in the City of Birmingham, County of Oakland, State of Michigan.

3.     Charge is a Delaware corporation with its offices and principal place of business located at 125 Park Avenue, 25th Floor, New York, New York 10017.

4.      PTGi is a Delaware corporation with its offices and principal place of business located at 125 Park Avenue, 25th Floor, New York, New York 10017.

5.      ANS is a New York limited liability corporation with its offices and principal place of business at 12 Elmwood Road, Albany, New York 12204-2410, which is registered to do and does business in Michigan and operates Charge Infrastructure as one of its unincorporated divisions.

6.      Charge Infrastructure is an unincorporated division of ANS with its offices and principal place of business at 34100 Woodward Ave., Ste. 230, Birmingham, MI 48009.

7.      Upon information and belief, Andrew Fox is a resident of the State of Florida. He is the former Chairman of the Board and Chief Executive Officer of Charge and remains a member of its Board of Directors.

8.      Upon information and belief, Craig Denson is a resident of the State of Florida. He is the interim Chief Executive Officer of Charge and has been the Chief Operating Officer and a Director of Charge since October, 2020, its Chief Compliance Officer since November, 2021, its Secretary since December, 2021, and was its Interim Chief Financial Officer from January, 2021, until September, 2021. Prior to its acquisition by Charge in 2020, Mr. Denson had been the President and CEO of PTGi since May, 2012, and remained President of PTGi after its acquisition by Charge through at least the end of November, 2021.

9.     Upon information and belief, Paolo (Paul) Fettuccia is a resident of the State of New York. He has been the Chief Executive Officer and President of ANS, a subsidiary of Charge, since its acquisition by Charge in May, 2021.

10.     Upon information and belief, Michael Wojtowicz is a resident of the State of New Jersey. He has been the Chief Executive Officer and President of B W Electrical Services, LLC ("BWES"), a subsidiary of Charge Enterprises, Inc, since its acquisition by Charge in December, 2021.

## JURISDICTION AND VENUE

11.     The amount in controversy exceeds $75,000 exclusive of interest and costs.

12.     This Court has subject matter jurisdiction over Plaintiff's claims under and pursuant to 28 USC § 1331 (federal question jurisdiction), 28 U.S.C. § 1332 (diversity jurisdiction), 28 U.S.C. §§ 1337, 1343 (civil rights), and 29 USC §216(b) (equal pay).

13.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiff's state law claims for violations of the ELCRA, M.C.L.A. 600. 2919a, and Michigan common law.

14.     This Court has personal jurisdiction over Charge, PTGi, and ANS because each maintains offices and engages in regular and systematic business and other activities within the Eastern District of Michigan through Charge Infrastructure

and the acts attributed to each of these Charge Defendants that give rise to Plaintiff's claims occurred and adversely affected her within the Eastern District of Michigan.

15.     This Court has personal jurisdiction over the Charge Defendants because Plaintiff was employed at and performed the duties and responsibilities of her various positions with the Charge Defendants at all times relevant from the Charge Infrastructure offices which originally were in Bloomfield Hills, Michigan, and later relocated to Birmingham, Michigan.

16     Venue is proper in this district court pursuant 28 U.S.C. §1391(b) and (c) because Plaintiff resides within the Eastern District of Michigan; Charge, PTGi, and ANS maintain offices and engage in regular and systematic business and other activities within the Eastern District of Michigan; and the events that give rise to Plaintiff's claims occurred or had consequences on Plaintiff within the Eastern District of Michigan.

17.     Venue also is convenient in this judicial district.

## COMMON FACTUAL ALLEGATIONS

### Charge Enterprise Businesses

18.     Charge is publicly traded electrical, broadband and electric vehicle ("EV") charging infrastructure company which wholly owns and operates a group of companies, including PTGi, ANS, and the Charge Infrastructure unincorporated division of ANS, among other companies.

19.     Charge operates in two segments: infrastructure which has a primary focus on the EV charging business, broadband and wireless data transmission services, and electrical contracting services; and telecommunications, which provides connection of voice calls and data to global carriers.

20.     Charge's primary focus purportedly consists of building, designing, and operating seamless EV charging infrastructures.

21.     Charge currently markets its capacity to design, engineer, build, and operate seamless EV charging infrastructures primarily to automotive original equipment manufacturers ("OEMs") and their franchised automotive dealerships around the county.

22.     PTGi provides voice communication services for national telecom operators, mobile operators, Voice over Internet Protocol ("VOIP") carriers, wholesale carriers, prepaid operators, Value Added Resellers ("VAR") and VOIP service operators.

23.     ANS is an engineering, furnishing and installation provider of telecommunications for next generation broadband solutions.

24.     The services that ANS offers to its customers are in-building wireless, cell tower services, network infrastructure, DC power systems, and installation, monitoring and maintenance of EV charging stations.

25.     ANS also provides communications system and DC power system test and turn up and 24-7 maintenance and monitoring services.

26.     Charge Infrastructure has a primary focus on two fast growing sectors: EV charging and Telecommunications Network 5G, including cell tower, small cell, and in-building applications. Its services for these two sectors include: design and engineering, equipment specification and sourcing, installation, data & software solutions, and service and maintenance.

**Ms. Antakli's Charge Employment Relationships**

27.     On July 28, 2021, Charge and PTGi hired Ms. Antakli as the Director of Administration for Charge. She commenced employment in this capacity on August 13, 2021, and reported to Charge CEO, Andrew Fox.

28.     As Charge's Director of Administration, Ms. Antakli received an initial annual base salary in the amount of $150,000, various health and retirement benefits, she was eligible for annual bonuses, and she was granted options to acquire 200,000 shares of Charge publicly traded stock with a $3.20 per share exercise price and 25% of the options vesting and exercisable on August 17, 2022, another 25% of the options vesting and exercisable on August 17, 2023, another 25% of the options vesting and exercisable on August 17, 2024, and another 25% of the options vesting and exercisable on August 17, 2025.

29.     At the time of Ms. Antakli's hire by Charge and PTGi, Mr. Mark LeNeve was functioning as the Chief Business Officer for Charge.

30.     Effective October 28, 2021, Charge and PTGi promoted Ms. Antakli to Chief Business Officer for Charge and to succeed Mr. LeNeve who had been promoted to President of Charge. She reported to Mr. LeNeve in this capacity until her employment was terminated, effective June 9, 2023.

31.     As Chief Business Officer for Charge, Ms. Antakli led Charge's EV Charging infrastructure business, including business strategy, operations, marketing and sales operations, partner relationships, industry relations, and public relations.

32.     Ms. Antakli was very well qualified for her position as Chief Business Officer for Charge since she had previously served as President and Chief Operating Officer of Intraco Corporation, a global export management firm with a focus on architectural glass and OEM automotive distribution, and because she has extensive operational leadership experience encompassing purchasing, logistics coordination, financing mechanisms for manufacturers and customers, strategic joint ventures, and global sales strategy.

33.     Indeed, the Charge Defendants acknowledged both before and after Ms. Antakli's employment termination that she was a valued and productive member of Charge who provided excellent service.

34.    As Chief Business Officer for Charge, Ms. Antakli received an initial annual base salary in the amount of $230,000, various health and retirement benefits, she was eligible for annual bonuses, and she was granted options to acquire 1, 250, 000 shares of Charge publicly traded stock with a $ 3.00 per share exercise price with 25% of the options vesting and exercisable on October 28, 2022, another 25% of the options vesting and exercisable on October 28, 2023, another 25% of the options vesting and exercisable on October 28, 2024, and another 25% of the options vesting and exercisable on October 28, 2025.

**Ms. Antakli's Procurement of Substantial Business for the Benefit of Charge**

35.    As Chief Business Officer for Charge during the period between October 28, 2021, and June 19, 2023, Ms. Antakli collaborated with Mr. LeNeve and other Charge leadership to successfully execute Charge's vision.

36.    As Chief Business Officer for Charge during the period between October 28, 2021, and June 19, 2023, Ms. Antakli developed and effectuated EV charging infrastructure business development strategies for the benefit of Charge.

37.    As Chief Business Officer for Charge during the period between October 28, 2021, and June 19, 2023, Ms. Antakli recruited qualified staff needed by the Charge Infrastructure business to effectively and efficiently develop and grow Charge's EV charging infrastructure business.

38.    As Chief Business Officer for Charge during the period between October 28, 2021, and June 19, 2023, Ms. Antakli procured, fostered, and initiated customer relationships which generated substantial business for the Charge EV charging infrastructure business with companies, including, but not limited to, General Motors, Toyota, BMW, Stellantis, Genesis and Hyundai Motor Company and affiliated dealerships; automotive dealer groups; affiliated industry companies like Eaton Power; and Electric Vehicle Service Equipment ("EVSE") providers such as SK Signet, Autel, Blink/SemaConnect, FreeWire, and Siemens.

39.    As Chief Business Officer for Charge during the period between October 28, 2021, and June 19, 2023, Ms. Antakli grew the Charge EV charging infrastructure business from one with negligible revenues to one with contracts for EV infrastructure projects that approximated $50 million during the first half of 2023 alone.

40.    On April 19, 2023, Charge publicly reported that it had a $107 million backlog of signed infrastructure projects with EV infrastructure projects representing more than 20% of the backlog driven by the significant growth in its EV infrastructure business for which Ms. Antakli had been responsible.

41.    In this regard, Charge's CEO, Andrew Fox, stated:

"We have demonstrated through our record backlog that we continue to provide essential infrastructure services in the EV charging, broadband

infrastructure and electrical infrastructure markets. The growth of our backlog is a testament to the leadership of our infrastructure divisions, the processes that we are implementing, and the teams that we are building."

"The growth of our EV charging infrastructure division, Charge Infrastructure (CI), reinforces our strategy to focus on the EV transition as a pillar of our company's future. CI's backlog growth, now representing over 20% of the total, supports that our unique and specialized offering is valued by our clients…"

42.    On August 1, 2023, Charge publicly reported that as of June 30, 2023, it had a $138 million backlog of signed infrastructure projects with EV infrastructure projects representing 34% or $47 million of the backlog driven by the significant growth in its EV infrastructure business for which Ms. Antakli had been responsible until June 19, 2023.

**Charge's Discriminatory Compensation Practices**

43.    As Chief Business Officer for Charge, Ms. Antakli was employed by the Charge Defendants in accordance with the terms of an implied employment agreement, evinced by the employment offers made to her,  Charge bonus and incentive compensation plans, Charge stock option grants and applicable stock agreements, and representations made to her by Messrs. Fox, LeNeve, Denson, and Kenneth Orr, which provided, and she otherwise legitimately expected, that she

would be treated the same as the Charge Defendants comparably employed male employees with respect annual base salary, stock grants, and bonus or other incentive compensation.

44.     Charge leadership acknowledged that Ms. Antakli's base annual salary as Chief Business Officer for Charge since 2021 was at least One Hundred Thousand Dollars less than the base annual market salary for her position and not otherwise equivalent to her value to the Charge.

45.     The work performed by Ms. Antakli while she was employed as Chief Business Officer for Charge was at least equal to the work performed by Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

46.     Ms. Antakli's job as Chief Business Officer for Charge required skill, effort, and responsibility at least equal to the jobs of Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

47.     Ms. Antakli's job as Chief Business Officer for Charge was performed under working conditions at least similar to, but actually more difficult than, those pertaining to the jobs of Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

48.     Messrs. Denson, Fettucia, and Wojtowicz and Ms. Antakli's other male peers at Charge received annual salaries, annual bonuses, stock grants, and other benefits that substantially exceeded what Ms. Antakli had received as Charge's Chief Business Officer since 2021 because they are men although her contributions to Charge greatly exceeded theirs.

49.     Ms. Antakli received less annual base salary, annual bonuses, stock grants, and other benefits than Messrs. Denson, Fettucia, and Wojtowicz and Ms. Antakli's other male peers at Charge had received since 2021 because of her sex although her contributions to Charge greatly exceeded theirs.

50.     Ms. Antakli received less annual base salary, annual bonuses, stock grants, and other benefits than Messrs. Denson, Fettucia, and Wojtowicz had received since 2021 because of her sex although the new business that she had procured for Charge and her contributions to the Charge Defendants greatly exceeded theirs.

**Charge's Acknowledgement of Ms. Antakli's Exemplary Job Performance**

51.     Ms. Antakli's job performance as Chief Business Officer for Charge had been consistently evaluated as exemplary by Messrs. Fox and LeNeve.

52.     Ms. Antakli had never received substantive discipline, warnings pertaining to her job performance or conduct, or notice that her job was in jeopardy throughout her Charge employment.

53.     Indeed, the Charge Defendants acknowledged both before and after Ms. Antakli's employment termination that she was a valued and productive member of Charge who had provided excellent service.

54.     In June, 2022, Ms. Antakli was named one of Insider's Power Players because of her contributions to the growth of the EV industry.

55.     In late March, 2023, Mr. LeNeve exchanged emails with Mr. Denson and Kenneth Orr, a Charge Board member with a substantial investment in the company, concerning a performance-based bonus plan he had developed for the benefit of Charge Infrastructure employees which included consideration that would have been due to Ms. Antakli "in a reflection of her value to the company."

56.     On June 2, 2023, Mr. Fox sent an email to Ms. Antakli in which he acknowledged "the remarkable job" Ms. Antakli had been doing and stated, "Your dedication is deeply appreciated."

57.     On June 22, 2023, Ms. Antakli was notified by the publication, Crain Communications in Detroit, Michigan, that she had been selected as a Notable Leader in Energy by its editorial team because her accomplishments on behalf of Charge.

**Ms. Antakli's Employment Termination Notwithstanding Charge's Acknowledgment of Her Exemplary Job Performance**

58.     During the late Fall, 2022, or early Winter, 2023, Mr. Denson told Ms. Antakli and Mr. LeNeve that the Charge Defendants had preferred that a male

industry expert be hired or assigned to the role as Chief Business Officer for Charge because of the nature of the EV business and industry.

59. On June 19, 2023, Ms. Antakli was notified by Mr. LeNeve and Ms. Jamie Yung, Charge's Human Resources Director, that her Charge employment had been terminated without cause.

60. Ms. Antakli was given no other reason for this unjustified, discriminatory adverse action.

61. Ms. Antakli was advised that the decision to terminate her employment was made because Messrs. Fox, Denson, Fettucia, and Wojtowicz had wanted her "out" or "gone" although Ms. Antakli had reported to Mr. LeNeve and she did not directly report to any of them.

62. Messrs. Fox, Denson, Fettucia, and Wojtowicz had wanted her "out" or "gone" and made the decision to terminate Ms. Antakli's employment although she had grown the Charge EV charging infrastructure business from one with negligible revenues to one with contracts for EV charging infrastructure projects that approximated $50 million during the first half of 2023 alone and the Charge Defendants had routinely acknowledged both before and after Ms. Antakli's employment termination that she was a valued and productive member of Charge who provided excellent service, who had done a "remarkable job," and whose " dedication is deeply appreciated."

63.     Messrs. Fox, Denson, Fettucia, and Wojtowicz had wanted her "out" or "gone" and made the decision to terminate Ms. Antakli's employment because they were intimidated by her as a strong and very effective woman business leader who freely expressed her opinions about best and effective business practices and business development strategies.

64.     Messrs. Fox, Denson, Fettucia, and Wojtowicz had wanted her "out" or "gone" and made the decision to terminate Ms. Antakli's employment because they had decided consistent with statements previously made by Mr. Denson to Ms. Antakli and Mr. LeNeve that they had preferred that a man be hired or assigned to the Charge Chief Business Officer role.

65.     Charge later assigned and/or hired one or more men to assume Ms. Antakli's former responsibilities, including Messrs. Fettucia and Wojtowicz and Mr. Samuel Barnes, whom Ms. Antakli had recently hired, and recently announce that Mr. Paul Williams had succeeded to her former role.

66.     The Charge Defendants' post hac purported reasons for under compensating Ms. Antakli and the termination of her employment are not true and are pre-texts for discrimination against her on account of her sex.

**COUNT I**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**SEX DISCRIMINATION**

67.     Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter reiterated paragraph by paragraph.

68.     At all times relevant, Charge, PTGi, and ANS were each an "employer" of Plaintiff as this term is defined by section 201(a) of the Michigan Elliott-Larsen Civil Rights Act, MCL §§37.2101, *et seq.* ("ELCRA"). *See* MCL §37.2201(a).

69.     At all times relevant, Messrs. Fox, Denson, Fettucia, and Wojtowicz were each a "person" as this term is defined by section 103(g) of the Michigan Elliott-Larsen Civil Rights Act, MCL §§37.2101, *et seq.* ("ELCRA"), *see* MCL §37.2103(g), and was an agent of Charge, PTGi, and ANS with respect to terms and conditions of and the termination of Plaintiff's former Charge employment.

70.     At all times relevant herein, under the ELCRA, Plaintiff had a right to employment with Charge and PTGi free from discrimination against her based on her sex.

71.     Charge, PTGi, and ANS and Messrs. Fox, Denson, Fettucia, and Wojtowicz violated Plaintiff's rights under the ELCRA by:

       A.     providing her with annual salary, annual bonuses, stock grants, and other benefits that were less than what Messrs. Denson, Fettucia, and Wojtowicz and Ms. Antakli's other male peers at Charge had received although the new business that she had procured for Charge and her contributions to Charge greatly exceeded theirs because of her sex; and

B.      terminating her employment without cause and because of her

sex.

72.    The discriminatory practices at issue were intentional and willful and

were committed with malice and with reckless indifference to Plaintiff's rights and

sensibilities.

73.    As a direct and proximate result of Defendants' violation of Plaintiff's

civil rights as set forth by the ELCRA, she has suffered damages, including but not

limited to, loss of earnings, loss of earning capacity, lost future earnings, the lost

value of fringe and retirement benefits, lost value of Charge stock and stock options,

lost job and career opportunities, damage to her good name and reputation in the

community, mental and emotional distress, humiliation and embarrassment, loss of

enjoyment of the ordinary pleasures of everyday life, and the loss of the ability to

pursue employment of choice.

## COUNT II
## VIOLATION OF THE EQUAL PAY ACT OF 1963

74.    Plaintiff re-alleges and incorporates by reference each and every

paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

75.    At all times relevant, Charge, PTGi, and ANS were each an "employer"

of and "employ[ed]") Plaintiff as these terms are defined by section 203(d) and (g)

of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq. See* 29 U.S.C. §203 (d)

and (g).

76.    At all times relevant, Charge, PTGi, and ANS were each an "enterprise" as this term is defined by section 203(r) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (r).

77.    At all times relevant, Plaintiff was an "employee" of Charge, PTGi, and ANS as this term is defined by section 203(e) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (e).

78.    At all times relevant, Messrs. Fox and Denson were each a "person" as this term is defined by section 203(a) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (a).

79.    The Equal Pay Act of 1963 ("EPA), 29 U.S.C. §206(d), is an amendment to the Fair Labor Standards Act and prohibits "employer[s] ... [from] discriminat[ing] … on the basis of sex by paying wages to employees [...] at a rate less than the rate [paid] to employees of the opposite sex [...] for equal work on jobs [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions[.]"

80.    The work performed by Plaintiff while she was employed as Chief Business Officer for Charge was at least equal to the work performed by Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

81.     Plaintiff's job as Chief Business Officer for Charge required skill, effort, and responsibility at least equal to the jobs of Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

82.     Plaintiff's job as Chief Business Officer for Charge was performed under working conditions at least similar to, but actually more difficult than, those pertaining to the jobs of Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

83.     The Charge Defendants' representatives violated Plaintiff's rights under the EPA by:

A.     Failing to provide Plaintiff with a rate of pay inclusive of annual base salary, annual bonuses, stock grants, and other benefits that was equal to what Messrs. Denson, Fettucia, and Wojtowicz and Plaintiff's other male peers at Charge had received and continue to receive because of her sex although the new business that she had procured for Charge and her contributions to Charge greatly exceeded theirs.

84.     The discriminatory practices at issue were intentional and willful and were committed with malice and with reckless indifference to Plaintiff's rights and sensibilities.

85.     As a direct and proximate result of Defendants' violation of  Plaintiff's civil rights as set forth in the EPA, Plaintiff has and will continue to suffer damages, including but not limited to, loss of earnings, loss of earning capacity, lost future earnings, the lost value of fringe and retirement benefits, lost value of Charge stock and stock options, lost job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of enjoyment of the ordinary pleasures of everyday life, and the loss of the ability to pursue employment of choice.

**Count III**
**Breach of Contract**

86.     Plaintiff re-alleges and incorporates by reference the allegations stated in the preceding paragraphs as if reiterated paragraph by paragraph in this Count.

87.     Plaintiff accepted her position as Chief Business Officer for Charge in consideration for the Charge Defendants' agreement, and she otherwise legitimately expected, that she would be treated the same as the Charge Defendants comparably employed male employees with respect annual base salary, stock grants, and bonus or other incentive compensation.

88.     The Charge Defendants breached Plaintiff's employment contract during the period since 2021 when they paid her a base annual salary as Chief Business Officer for Charge that was at least One Hundred Thousand Dollars less than the market base annual salary for her position,  otherwise was not equivalent to

her value to the Charge Defendants, and was  substantially less than the base annual salaries tendered to Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

89.    The Charge Defendants breached Plaintiff's employment contract during the period since 2021 when they paid her a base annual salary and provided her with stock grants and bonus or other incentive compensation as Chief Business Officer for Charge that were less than what had been received by Messrs. Denson, Fettucia, and Wojtowicz and Plaintiff's other male peers at Charge although her contributions to Charge greatly exceeded theirs.

90.    As a direct and proximate result of the Charge Defendants' breaches of its contract, Plaintiff has and will continue to suffer damages, including but not limited to, loss of earnings, loss of earning capacity, lost future earnings, the lost value of fringe and retirement benefits, lost value of Charge stock and stock options, lost job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of enjoyment of the ordinary pleasures of everyday life, and the loss of the ability to pursue employment of choice.

**Count IV**
**Promissory Estoppel**

91.    Plaintiff re-alleges and incorporates by reference the allegations stated in the preceding paragraphs as if reiterated paragraph by paragraph in this Count.

92.     The Charge Defendants made enforceable promises to Plaintiff that she would be treated the same as the Charge Defendants comparably employed male employees with respect annual base salary, stock grants, and bonus or other incentive compensation to induce her to became the Chief Business Officer for Charge, evinced by the employment offers made to her,  Charge bonus and incentive compensation plans, Charge stock option grants and applicable stock agreements, and representations made to her by Messrs. Fox, LeNeve, Denson, and Kenneth Orr.

93.     The Charge Defendants reasonably expected that their promises to Plaintiff would induce her to grow the Charge EV charging infrastructure business from one with negligible revenues to one with contracts for EV charging infrastructure projects that approximated $50 million during the first half of 2023 alone.

94.     In reliance upon the promises made to her, Plaintiff grew the Charge EV charging business from one with negligible revenues to one with contracts for EV infrastructure projects that approximated $50 million during the first half of 2023 alone.

95.     The Charge Defendants breached the promises made to Plaintiff during the period since 2021 when they paid her a base annual salary as Chief Business Officer for Charge that was at least One Hundred Thousand Dollars less than the market base annual salary for her position,  otherwise was not equivalent to her value

to the Charge Defendants, and was substantially less than the base annual salaries tendered to Messrs. Denson, Fettucia, and Wojtowicz and her other male peers at Charge although her contributions to Charge greatly exceeded theirs.

96.    The Charge Defendants breached the promises made to Plaintiff during the period since 2021 when they paid her a base annual salary and provided her with stock grants and bonus or other incentive compensation as Chief Business Officer for Charge that were less than what had been received by Messrs. Denson, Fettucia, and Wojtowicz and Plaintiff's other male peers at Charge although her contributions to Charge greatly exceeded theirs.

97.    As a direct and proximate result of the Charge Defendants' breach of promises to Plaintiff, Plaintiff has and will continue to suffer damages, including but not limited to, loss of earnings, loss of earning capacity, lost future earnings, the lost value of fringe and retirement benefits, lost value of Charge stock and stock options, lost job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of enjoyment of the ordinary pleasures of everyday life, and the loss of the ability to pursue employment of choice.

## V.
## UNJUST ENRICHMENT

98.    Plaintiff re-alleges and incorporates by reference the allegations stated in the preceding paragraphs as if reiterated paragraph by paragraph in this Count.

99.   During her tenure with Charge, Plaintiff grew the Charge EV charging business from one with negligible revenues to one with contracts for EV infrastructure projects that approximated $50 million during the first half of 2023 alone.

100.   Throughout this period of time, the Charge Defendants intentionally and deceptively paid Plaintiff a base annual salary and provided her with stock grants and bonus or other incentive compensation as Chief Business Officer for Charge that were less than what had been received by Messrs. Denson, Fettucia, and Wojtowicz and Plaintiff's other male peers at Charge although her contributions to Charge greatly exceeded theirs.

101.   Throughout this period of time, the Charge Defendants received the benefit of Plaintiff's procurement of new business for Charge, but intentionally and deceptively failed and refused to pay Plaintiff for the fair and reasonable value of her new business procurement.

102.   The Charge Defendants have been unjustly enriched at Plaintiff's expense by their intentional and deceptive failure and refusal to pay Plaintiff for the fair and reasonable value of her new business procurement.

103.   As a direct and proximate result of the Charge Defendants' breach of their its duties to pay fair compensation to Plaintiff for new business she had procured, Defendants have been unjustly enriched by amounts that exceed One

Million Dollars and Plaintiff has and will continue to suffer damages, including but not limited to, loss of earnings, loss of earning capacity, lost future earnings, the lost value of fringe and retirement benefits, lost value of Charge stock and stock options, lost job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of enjoyment of the ordinary pleasures of everyday life, and the loss of the ability to pursue employment of choice.

## VI.
## CONVERSION

104.   Plaintiff re-alleges and incorporates by reference the allegations stated in the preceding paragraphs as if reiterated paragraph by paragraph in this Count.

105.   During her tenure with Charge, Plaintiff grew the Charge EV charging business from one with negligible revenues to one with contracts for EV infrastructure projects that approximated $50 million during the first half of 2023 alone.

106.   Throughout this period of time, the Charge Defendants intentionally and deceptively paid Plaintiff a base annual salary and provided her with stock grants and bonus or other incentive compensation as Chief Business Officer for Charge that were less than what had been received by Messrs. Denson, Fettucia, and Wojtowicz and Plaintiff's other male peers at Charge although her contributions to Charge greatly exceeded theirs.

107.   Throughout this period of time, the Charge Defendants received the benefit of Plaintiff's procurement of new business for Charge, but intentionally and deceptively failed and refused to pay Plaintiff for the fair and reasonable value of her new business procurement.

108.   Throughout this period of time, the Charge Defendants and/or their executive and other representatives converted the amount of compensation that should have been paid to Plaintiff to their own use in violation of Michigan common law and MCLA 600.2919a.

109.   Pursuant to MCLA 600.2919a, Plaintiff is entitled to three times the actual damages she has sustained due to the past and continuing acts of conversion by the Charge Defendants and/or their executive and other representatives.

110.   As a direct and proximate result of Defendants acts of conversion, Defendants have been unjustly enriched by amounts that exceed One Million Dollars and Plaintiff has and will continue to suffer damages, including but not limited to, loss of earnings, loss of earning capacity, lost future earnings, the lost value of fringe and retirement benefits, lost value of Charge stock and stock options, lost job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of enjoyment of the ordinary pleasures of everyday life, and the loss of the ability to pursue employment of choice.

**WHEREFORE,** Plaintiff Nicole Antakli requests that this Court enter an Order and Judgment against the Charge Defendants awarding to Plaintiff:

a.     Compensatory damages to which she is found to be entitled, inclusive of back and front pay, bonus, stock awards and options, reimbursement for costs incurred by Plaintiff to replace lost benefits, and other compensation lost by Plaintiff due to discrimination against her and other violations of her statutory, common law and contractual rights;

b.     Liquidated damages for their violations of the Equal Pay Act of 1963;

c.     Treble damages for violation of MCLA 600.2919a;

d.     Compensatory damages for mental anguish, emotional distress, humiliation and injury to her reputation;

e.     Punitive and/or exemplary damages;

f.     Reasonable attorney fees and costs, including expert witness fees and pre and post judgment interest;

g.     Injunctive or equitable relief to foreclose further violations of the ELCRA and EPA; and

h.     Such other legal or equitable relief as this Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff Nicole Antakli, by her attorneys, GASIOREK, MORGAN, GRECO, MCCAULEY & KOTZIAN P.C., demands a trial by Jury.

Respectfully submitted,

**GASIOREK MORGAN,**

BY:  */s/ Raymond J. Carey*
Raymond J. Carey (P33266)
Attorney for Plaintiff
30500 Northwestern Hwy, Ste. 425
Date:  November 1, 2023          Farmington Hills, MI 48334
(248) 865-0001
rcarey@work-lawyers.com